Filed 3/27/13  P. v. Mushegyan CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B238583 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA363298) |
| v. | |
| EDMOND MUSHEGYAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Ronald S. Coen, Judge.  Affirmed.

Law Offices of Daniel V. Behesnilian and Daniel V. Behesnilian for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Edmond Mushegyan was convicted, following a jury trial, of one count of attempted murder in violation of Penal Code sections 187 and 664,[1] one count of shooting at an occupied vehicle in violation of section 246, and one count of assault with a semi-automatic firearm in violation of section 245, subdivision (b). The jury found true various firearm allegations within the meaning of sections 12022.5 and 12022.53, including the allegation that appellant personally used a firearm within the meaning of section 12022.53, subdivision (d), and also found true the allegation that appellant personally inflicted great bodily harm within the meaning of section 12022.7, subdivision (a). The trial court sentenced appellant to 32 years to life in prison, consisting of the midterm of seven years for the attempted murder plus a 25-years-to-life enhancement term for the section 12022.53, subdivision (d) firearm use allegation. The court imposed but stayed sentence on the sections 245 and 246 convictions.

Appellant appeals from the judgment of conviction, contending that there is insufficient evidence to support the attempted murder conviction, and further contending that the trial court erred in instructing the jury with CALCRIM No. 604 on unreasonable self-defense and failing to instruct the jury on voluntary manslaughter under a heat of passion theory. He also contends that the trial court abused its discretion in denying his motion for a new trial. We affirm the judgment of conviction.


Facts

On October 11, 2009, Timothy Dewitt drove to Hollywood to go out on a second date with Lea Patrick. After the date, sometime between 2:00 a.m. to 3:00 a.m., the couple went to Ms. Patrick's apartment complex in Hollywood on Yucca Street. Mr. Dewitt parked his Ford F-150 truck on Las Palmas Avenue, leaving the front passenger window open but locking all the doors. He then walked Ms. Patrick to her apartment door, then began walking back to his truck.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

As Mr. Dewitt approached his truck, he noticed the cabin light was turned on, the door had been opened, and someone was inside the passenger side. He shouted, "Hey, hey, hey" and ran toward the truck. He also said something like, "What the fuck are you doing?" The person inside the F-150, later identified as appellant, jumped out. Mr. Dewitt kicked appellant's chest as hard as he could, and appellant fell against the truck's door and then toward the ground in a sitting position. Mr. Dewitt asked, "What are you doing? What are you doing?"

Appellant stood up, pulled out a gun, and pointed it at Mr. Dewitt. The gun touched the area of Mr. Dewitt's chest over his heart. Mr. Dewitt was afraid when he saw the gun. Appellant gestured at his uniform and his gun, and told Mr. Dewitt something to the effect of "Do you see this? Do you see this? You respect this. You respect this gun." Mr. Dewitt saw appellant wore a tan-colored security guard uniform.

Mr. Dewitt was afraid appellant might use the gun, and began apologizing and backing away toward the driver's side of the truck. Mr. Dewitt told appellant that "this never happened" and he was just going to leave. Appellant stood on the sidewalk near the rear of the truck and continued to point his gun at Mr. Dewitt.

Mr. Dewitt got into the truck. Because there was a car parked in front of the F-150, Mr. Dewitt had to drive the truck in reverse for a foot or two before he had enough space to drive forward out of the parking space. He intended to go home. As Mr. Dewitt drove forward, he vaguely remembered hearing a bang and crashing into something. He also recalled having a wet feeling down his back and not knowing why, and the medical personnel who tried to help him.

Mr. Dewitt testified that at no point did he attempt to run appellant over, nor was he "revving the engine." He did not remember "punching the gas" at any point, he did not remember yelling anything at appellant as he drove away from the parking space, and he did not remember attempting to make a three-point turn on Las Palmas Avenue. He agreed that since the location of the crash was south of where he parked, he must have turned his truck at some point. He did not remember turning, however.

3

Mr. Dewitt was in the hospital for about a week, receiving medical care for a gunshot wound to the back of his head. Surgery removed the bullet from his brain. As a result of this injury, he lost 50 percent of his vision in both eyes, and he lost his driver's license because he is legally blind.

Los Angeles Police Department Officer Magdalena Chun arrived at the 1700 block of Las Palmas Avenue about 3:30 or 3:50 a.m. Officer Chun saw a truck that had crashed into a block wall, and a man who appeared to be wounded lying next to the truck. Appellant came up to Officer Chun, told her that he worked as a security guard for 1776 Las Palmas, and had seen what happened.

Appellant said he was on his routine patrol in the parking lot next to 1776 Las Palmas when he had an "exchange of words" with someone inside a truck. As appellant walked away from the truck, he saw a second car pull out from behind the truck. Appellant heard gunshots and took cover. Appellant then heard the sound of a car crashing into a wall.

Officer Chun told appellant to stay where he was while she put up the crime scene tape. Officer Chun then heard a police radio broadcast describing the shooting suspect as a male Hispanic security guard. When she returned to the location where she had spoken with him, he was no longer there.

In the meantime, Los Angeles Police Officer Jason Marquez had also arrived at the crime scene. Mr. Dewitt was lying next to his truck, and blood was coming from his head. Mr. Dewitt said a security guard shot him.

Officer Marquez interviewed appellant, who wore a brown-colored security guard uniform with patches. Appellant said that as he was on patrol, he saw the door to a Ford F-150 was open. He exchanged words with the shooting victim and then left. As he was leaving, he heard a loud screeching noise and then saw a black Dodge Charger pull up next to the victim's vehicle. He heard two gunshots and then saw the F-150 crash into a parked vehicle.

Los Angeles Police Department Sergeant Enrique Mendoza found spent casings or fragments on Las Palmas Avenue. They came from a .40 caliber Glock Model 23.

4

Appellant was subsequently arrested and a .40 caliber Glock Model 23 was seized from him.

Events surrounding the shooting were heard or seen by two witnesses. John Gean overheard an argument about 3:00 a.m. which involved a lot of profanity-laced shouting. The only statement he could understand was, "You be on your way and I will be on mine." About five minutes after that statement, he heard the sound of a truck accelerating, followed by the sounds of gunfire and a crash. Eden Spairow who lived in an apartment on North Cherokee, heard three gunshots at 3:30 a.m, looked out her window and saw a man dressed in what appeared to be a security uniform leisurely walking up and down the sidewalk. She saw the man reach down, pick up three things off the ground, and place them in his pocket.

The next day, Los Angeles Police Department Detective Sue Brandstetter and her partner, Detective Timo Illig, interviewed appellant at the Hollywood police station. Portions of the recorded interview were played for the jury. Appellant stated he understood his *Miranda* rights and agreed to speak with the detectives about the incident.

Appellant told the detectives the following, among other things: During appellant's encounter with Mr. Dewitt, he asked appellant, "What the fuck you doing to my car?" Appellant explained to Mr. Dewitt that he was a security guard, and he looked into his car because his window was open and he wanted to know whether he needed to call the police. Mr. Dewitt "cussed [him] out" and entered the car. Mr. Dewitt closed the door, drove straight a little, and then made a U-turn. Mr. Dewitt yelled at appellant, "I'm going to run you over motherfucker." Mr. Dewitt then tried to run over appellant, at which point appellant jumped onto the sidewalk and fired twice. Appellant's shots hit the car on the driver's side. The car then crashed into another parked car. Appellant denied that he was attempting to shoot the driver, and instead said he shot at the truck because he was afraid for his life. Appellant also said he fired because he wanted to scare the driver.

Detective Brandstetter asked appellant why he picked up the casings. Appellant said he picked up the casings because they were his, and he planned to do nothing with them. When appellant was asked why he told the responding officers that the shots came

5

from a black car, appellant replied that he said, "I just saw the black car zooming in." He did not know why the black car was relevant. Detective Illig asked appellant why he attempted to cover up his involvement in the shooting and why he did not tell the responding police officers that he shot Mr. Dewitt. Appellant said he did not believe that information was important, then said that information was important, but he "didn't think of it." Appellant also did not think to tell the officers that he picked up the casings. When Detective Illig told appellant that it seemed like he was trying to cover up his crime, appellant replied, "Probably I was afraid."

During the interview, appellant again denied that he was trying to hurt Mr. Dewitt. Appellant said, "If I try to hurt the guy, I would beat the crap out when he kicked me. I just didn't do it. I just verified who I am. I told him, you know, just let it go, bro. Just go have a good night and I'll close the door even for you . . . ."

Appellant told the detectives that when he returned to his car to put the casings inside his truck, he removed the magazine from his gun and replaced it with the magazine inside his belt. Appellant admitted that he should not have done this, and did not know why he did. Detective Brandstetter believed the magazine replacement was significant because it gave the appearance that the gun had not been recently fired. The magazine with two missing bullets was found in appellant's trunk. It was not until appellant was directly asked, "Where are the casings?" that he admitted they were inside his trunk.

Los Angeles Police Department Criminalist Marissa Bowen performed a bullet path analysis of the bullet impacts found on Mr. Dewitt's F-150. She determined that the projectile responsible for the impacts came from the rear and came from the left side of the vehicle toward the right side. She also observed three separate "defects" that arose from a single projectile. She explained that the projectile impacted the F-150 and then ricocheted to hit two other portions of the vehicle. She opined that the general direction of the projectile went from the back of the vehicle to the front, and it was not possible that the impact came from a gun that was in front of the vehicle.

In his defense, appellant offered the testimony of John Tyson, a vehicle accident reconstruction specialist. Mr. Tyson opined that after appellant's encounter with Mr.

6

Dewitt, Mr. Dewitt drove the F-150 north on Las Palmas Avenue. Mr. Dewitt then performed a three-point turn and drove south toward appellant. He passed appellant and stopped south of Franklin Place and in the driveway of an apartment complex. Mr. Tyson calculated that the F-150 was travelling between 22 and 30 miles per hour when it crashed.

Mr. Tyson reviewed the police report, which included schematics showing two bullet trajectories; one to the bed of the F-150 and one to the door area behind its cab. He opined that at the time the shots were fired, the F-150 was travelling 33 to 44 feet per second, and the two shots were fired within a half-second of each other. The path of one bullet was toward the tire. The path of the second bullet entered just behind the F-150's door and entered the rear of the cab. When defense counsel asked Mr. Tyson whether the "higher dimension" of the second bullet's impact was the result of recoil, he replied, "Well, if it's within half a second it's certainly very close to the first discharge." The tires were not flattened by the bullets.

Mr. Tyson admitted he had no training in guns and he was not a gun expert. He could not determine where appellant stood in relationship to the F-150, and that all he knew was that appellant was in "close proximity" to where the F-150 started.

Patricia Fant, a forensics firearm examiner, also testified for the defense. Her testimony was primarily concerned with the operation of the Glock 23.

Debra Glaser, a psychologist, also testified for the defense. She testified about the effects of stress, fight or flight, and tunnel vision.

## Discussion

1. Sufficiency of the evidence

Appellant contends that there is no evidence that he had a specific intent to kill and so there is insufficient evidence to support his conviction for attempted murder. He further contends that such a conviction violates his federal constitutional right to due process. We do not agree.

7

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, "we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]'" (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

Appellant contends that the only possible evidence of intent to kill came from the two shots fired at the victim's truck, and that the testimony of defense expert Tyson precluded a reasonable inference that those shots were aimed at the victim. Specifically, appellant contends that Tyson testified that the two shots were fired within a half-second of each other, the first shot was fired toward the tire and the second shot was fired slightly higher due to the recoil from the first shot. He further contends that Tyson's testimony was uncontradicted.

Appellant has overstated Tyson's testimony. Tyson's testimony about the order of the shots and the height of those shots was not contradicted. Tyson was not a firearms expert, however, and did not testify that the shot to the cab was higher due to gun recoil. Appellant's attorney asked Tyson if the higher shot "could have been done at the time of the recoiling?" Tyson replied: "Well, if it's within half a second it's certainly very close to the first discharge." Testimony about the effect of gun recoil on shot height came from defense expert Patricia Fant, a forensics firearms examiner. She testified that a gun recoils after a shot is fired, and that "there is a likelihood" that the shooter's hand goes up. She also testified that some people "flinch" in anticipation of the recoil and pull the gun

8

down. She further testified that experienced shooters can adjust for recoil and hit their intended target. Thus, nothing in the testimony of Tyson and Fant precluded an inference that appellant was aiming at the victim's head.

There is sufficient evidence to support a finding that appellant had the specific intent to kill the victim. Appellant shot the victim in the head at fairly close range.[2] It is more than reasonable to infer that a shot to the head is intended to kill. (See *People v. Leon* (2010) 181 Cal.App.4th 452, 464-465 [sufficient evidence of intent to kill where shot fired into car's right taillight hit and killed passenger and so must have been pointed at passenger]; see also *People v. Smith* (2005) 37 Cal.4th 733, 742 [intent to kill shown where shooter fired into vehicle from directly behind it and one car length away].) Further, appellant fired two shots at the truck, the second one while the truck was moving away. According to appellant's own expert, it was the second shot which hit Dewitt. Appellant must have adjusted his position to fire this shot.[3] This sort of repeated firing also supports an inference of an intent to kill. The inference in this case is only strengthened by the altercation which preceded the shooting. During that altercation, appellant pulled a gun on the victim and touched the gun to the victim's chest area over his heart, while demanding respect. Again, this supports an inference of an intent to kill the victim.

Since we have determined that "a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation], as is the due process clause of

---

[2] According to Tyson, the first shot was fired at the truck at an almost perpendicular angle, that is while the truck was in the street almost in front of appellant. The second shot was fired after the truck had travelled 15 feet away from appellant.

[3] Appellant fired the first shot at an angle almost perpendicular to the truck, which means that he fired as it was passing him. He fired the second shot from behind the truck and thus after it had passed him. Thus, he had to turn or move his arm to fire the second shot.

9

article I, section 15, of the California Constitution." (*People v. Osband* (1996) 13 Cal.4th 622, 690.)


    2.  Voluntary manslaughter instruction

    The trial court instructed the jury on attempted voluntary manslaughter under an imperfect self-defense theory.  Appellant contends that the trial court erred in failing also to instruct the jury, sua sponte, on attempted voluntary manslaughter under a heat of passion theory.  We see no error.

    """It is settled that in criminal cases, even in the absence of a request, the trial court must instruct . . . ."  [Citation.] . . . on lesser included offense when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. . . .'"" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

    A defendant who commits an intentional and unlawful killing, but who lacks malice, is guilty of the lesser included offense of voluntary manslaughter.  (*People v. Barton* (1995) 12 Cal.4th 186, 199.)  Lack of malice may be found in limited circumstances, either when the defendant acts upon "a sudden quarrel or heat of passion" or when he kills in the unreasonable but good faith belief in the need for self-defense. (*Ibid.*)

    Voluntary manslaughter under a heat of passion theory requires both provocation and heat of passion.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.)  Thus, in addition to adequate provocation there must be evidence that the defendant's reason was in fact obscured by passion at the time of the killing.  (*People v. Sedeno* (1974) 10 Cal.3d 703, 719.)

    Appellant contends that the evidence showed that "the physical confrontation between Appellant and Mr. Dewitt occurred in the course of a heated argument which took place after Mr. Dewitt attacked Appellant, left the scene, then turned his truck around, revved the engine and drove back toward Appellant."  He also contends that the evidence shows that he was "beaten and insulted" by Mr. Dewitt.  He further contends

10

that these actions by the victim resulted in "a double dose of adrenaline and tunnel vision" in appellant.

Even assuming for the sake of argument that Mr. Dewitt's statements to appellant and his act of kicking appellant in the chest could constitute legally adequate provocation, there is no evidence that appellant was actually provoked by this. Appellant told Detectives Brandsetter and Illig that appellant did not kick him that hard. Appellant also said that he remained calm and courteous after the kick and argument. Appellant also told the detectives, "If I try to hurt the guy, I would beat the crap out when he kicked me. I just didn't do it. I just verified who I am. I told him, you know, just let it go, bro. Just go have a good night and I'll close the door even for you . . . ." There is nothing in these statements to suggest that the argument and kick aroused feelings of rage or passion in appellant and obscured his reason.

Appellant also points to Mr. Dewitt's driving as an act of provocation. Again, assuming that this could be an act of provocation, there is no evidence that the act aroused feelings of passion or rage in appellant and obscured his reason. Appellant told police that he was afraid for his life when the truck drove toward him.[4] He also said that he fired to scare the driver. Neither statement shows rage or heat of passion.

Further, at no point did appellant's trial counsel argue that appellant was provoked or acting in the heat of passion. Counsel's arguments focused on appellant's fear and his self-defense claim.

Since there was no substantial evidence to support the giving of voluntary manslaughter under a heat of passion theory, the trial court did not err in failing to give such an instruction. To the extent that appellant claims that the lack of the instruction violated his federal constitutional rights, we do not agree. The federal Constitution does not give the defendant in a noncapital case the right to instructions on lesser included offenses. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 167.) Further, where no

_____

[4] Based on this statement by appellant, the jury was instructed on self-defense and imperfect self-defense.

11

substantial evidence supports a proposed jury instruction, refusing the instruction does not result in fundamental unfairness or an unreliable verdict. (*People v. Holloway* (2004) 33 Cal.4th 96, 141.)

3. Motion for a new trial

Appellant contends that the trial court erred in denying his motion for a new trial. His claim of error is based on his belief that the evidence is insufficient to support the jury's verdict, in particular the finding that he had a specific intent to kill. As we discuss, *ante*, there is sufficient evidence to support appellant's conviction. Accordingly, the trial court did not abuse its discretion in denying appellant's motion for a new trial.

4. CALCRIM No. 604

Appellant contends that the trial court erred in instructing the jury with CALCRIM No. 604 because that instruction incorrectly states the law concerning imperfect self-defense, and that the error was prejudicial under state and federal constitutional law. He further contends that his counsel was ineffective in failing to bring the error in the instruction to the trial court's notice.

The version of CALCRIM No. 604 used by the trial court read: "An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill a person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. [¶] The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: [¶] 1. The defendant took at least one direct but ineffective step toward killing a person. [¶] 2. The defendant intended to kill when he acted. [¶] 3. The defendant believed that he was in imminent danger of being killed or suffering great bodily injury. [¶] AND [¶] 4. The defendant believed that the immediate use of deadly

12

force was necessary to defend against the danger. [¶] BUT [¶] 5. The defendant's *beliefs* were unreasonable."  (Italics added.)

Appellant contends that the last sentence of the instruction is incorrect, specifically the use of the plural "beliefs."  As respondent points out, appellant's claim appears to be based on *People v. Her* (2009) 181 Cal.App.4th 349.  In that case, the Court of Appeal found that the attempted voluntary manslaughter instruction erroneously told the jury that imperfect self-defense existed only if a defendant had both the unreasonable belief that he was in imminent danger and the unreasonable belief that the use of deadly force was necessary to defend himself.  The Court held that only one belief need be unreasonable. (*Id*. at pp. 352-353.)  In October 2010, CALCRIM No. 604 was revised to explicitly state that "BUT [¶] 5.  At least one of the defendant's beliefs was unreasonable."

The Court in *Her, supra,* found the error in CALCRIM No. 604 to be, in effect, a technical one.  The Court found no reasonable likelihood that a jury would understand former CALCRIM No. 604 in the manner suggested by the defendant.  The Court looked at the instructions as a whole, including CALCRIM No. 505 on self-defense.  CALCRIM No. 505 tells the jury that if a defendant had both a reasonable belief that he was in imminent danger of being killed or suffering great bodily harm and if he reasonably believed the use of deadly force was necessary to defend himself, then the defendant was not guilty of any crime.  CALCRIM No. 604 told the jury that if the defendant held both of those foregoing beliefs but those beliefs were unreasonable, the defendant was guilty of attempted voluntary manslaughter.  The defendant in *Her,* like appellant in this case, claimed that if the jury found that the defendant held one reasonable and one unreasonable belief, the jury would believe that they were required to convict him of attempted murder.  "Thus, in his view, the jury could have understood the instructions to require a *harsher* verdict for a partially reasonable belief in the need to defend himself . . . than for a completely unreasonable belief in that regard."  (*Id*. at p. 354, original italics.)

The Court in *Her* rejected the defendant's claim of prejudice, explaining: "Although CALCRIM No. 604 erroneously stated that imperfect self-defense or defense

13

of another existed only if defendant's 'beliefs' were unreasonable, another part of the instruction made clear that '[t]he difference between complete self-defense . . . and imperfect self-defense . . . depends on whether the defendant's belief in the need to use deadly force was reasonable.'  Assuming for the sake of argument that the jury could have entertained a reasonable doubt as to whether defendant actually believed in the need to defend himself . . . , we conclude the jury would have understood from the instructions as a whole that the reasonableness of that belief (or those beliefs, if broken into components) went to whether defendant was guilty of attempted voluntary manslaughter or no crime at all, and not to whether he was guilty of attempted murder."  (*People v. Her*, *supra*, 181 Cal.App.4th at p. 354.)  Appellant offers no critique of the reasoning of *Her*.

Further, even assuming that a jury could understand former CALCRIM No. 604 in the manner suggested by appellant (and the defendant in *Her*), appellant's claim would still fail.  Appellant provides no plausible explanation of how, under the facts of this case, the jury could have found one belief reasonable and the other unreasonable.  Appellant suggests that his belief that he was in imminent danger from the truck might have been unreasonable, but his belief that he needed to fire at the vehicle to slow it down or prevent it from turning around was reasonable.  In appellant's view, because he actually believed he was in imminent danger, it was reasonable for him to believe that the use of deadly force was necessary to defend himself.  Reasonableness, however, is not determined from the defendant's point of view.  Since a reasonable person in appellant's position would not have believed himself to be in imminent danger to begin with, the reasonable person would not have believed that the use of deadly force was warranted.

The absence of any prejudice resolves appellant's federal constitutional claims and ineffective assistance of counsel claims.  (See *People v. Holt* (1997) 15 Cal.4th 619, 703 [ineffective assistance claim].)

14

Disposition

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ARMSTRONG, Acting P. J.


We concur:


MOSK, J.


KRIEGLER, J.